STATE OF MAINE                SUPERIOR COURT
CUMBERLAND, ss.              DOCKET NO. CR-12-1448

STANLEY MOTHERSIL

v.                        ORDER ON POST-CONVICTION REVIEW

STATE OF MAINE

## PROCEDURAL BACKGROUND

Stanley Mothersil ("Mothersil") pled guilty on July 27, 2011 to one count of Class B unlawful trafficking in scheduled drugs (Class B), 17-A M.R.S.A. § 1103(1-A)(A) (2012), and admitted to one count of criminal forfeiture. The court (Kelly, J.) sentenced him to a five-year period of incarceration with the Department of Corrections with all but one year suspended and a two-year probationary term.[1] The Court also imposed a $400 fine. The state dismissed the remaining drug trafficking charge as part of the plea agreement. Mothersil did not appeal his conviction or the sentence. Mothersil filed a petition for post-conviction review on February 28, 2012. On June 11, 2012, the Petitioner finished serving the unsuspended portion of his sentence at Maine State Prison. Since his release from prison, he has been detained under the authority of U.S. Immigration and Customs Enforcement (ICE) as a result of his conviction in this matter and is facing deportation proceedings.

## GROUNDS ALLEGED

---

[1] Execution of sentence was stayed to September 1, 2011.

The petitioner filed the motion now before the court alleging ineffective assistance of plea counsel in that he failed to advise Mothersil about the immigration consequences on a noncitizen of a conviction in this case. Petitioner contends that under *Padilla v. Kentucky*, 130 S. Ct. 1473 (2010), his plea did not represent a voluntary and intelligent choice among the alternative courses of action. Petitioner also argues that the performance of plea counsel was so deficient that the presumption of prejudice is warranted. At the hearing on his petition, Petitioner presented the transcript of the plea proceedings, his own testimony and that of Heather Howell, his girlfriend. The State presented the testimony of plea counsel.

EVIDENCE AT PCR HEARING

At the PCR hearing, the evidence was uncontroverted that plea counsel did not advise Mothersil of any immigration consequences. Indeed in all their interactions, plea counsel and Mothersil never discussed immigration issues. Plea counsel understood that Mothersil was from New York and never inquired further where he was born or whether he was a United States citizen. Mothersil, for his part, never told plea counsel that he was born outside of the United States or that he was not a citizen. The first time the question of citizenship arose was when the court inquired during the plea.

The Plea Transcript discloses that the plea judge at the Rule 11 plea on July 27, 2011 engaged the defendant in a lengthy and thorough Rule 11 colloquy as part of the felony plea. Consistent with M.R.Crim.P. 11, the court inquired whether he was Stanley Mothersil and what his date of birth was. The court took his plea of guilty. (Tr. 4.) The court then advised him that she would be asking him questions and she wanted to be sure that he understood what he was doing and the significance of it and the consequences of

2

it. *Id.* The court further inquired whether he understood that in pleading guilty he was giving up all of his trial rights, that if he went to trial he would be presumed innocent and that presumption could only be overcome if the State proved each element of the charge beyond a reasonable doubt. (Tr. 5-6.) The court inquired whether he was pleading guilty because he was in fact guilty and Mothersil replied, "Yes." (Tr. 8.) He also responded affirmatively when asked whether he was satisfied with the assistance of his attorney. *Id.* Mothersil assured the court that he had no complaints about his attorney. *Id.*

Mothersil assured the judge that he did not have any confusion at all that morning about what was going on. (Tr. 9.) The court then had the following colloquy with Mothersil:

> Court: Mr. Mothersil, where were you born, sir?
> Mr. Mothersil: Where?
> Court: Yeah.
> Mr. Mothersil: Ah, New York – Brooklyn, New York.
> Court: Okay. So, you are an American citizen?
> Mr. Mothersil: I am.
> Court: I ask that question because if you weren't there can be other complications that we need to know about before we take a plea, sir. Thank you.

(Tr. 9.)

Later during the Rule 11 hearing, the court advised Mothersil of the consequences of his plea:

> Court: Mr. Mothersil, do you understand that if I accept your plea you will have a conviction on your record, sir?
> Mr. Mothersil: Yes, ma'am.
> Court: Do you understand as a felon you will never again have the right to use or possess a firearm, sir, at any time—or for any reason?
> Mr. Mothersil: Yes, ma'am.
> Court: Do you understand that with this conviction on your record if you commit any crimes in the future the sentences you will receive for those crimes will be harsher because of this conviction.
> Mr. Mothersil: Yes, ma'am.
> Court: Keeping all this in mind, do you still wish to plead guilty to the charge of trafficking in Schedule W drugs?

3

Mr. Mothersil: Yes, ma'am.

(Tr. 11-12.) Before accepting Mothersil's plea and imposing sentence, the court inquired whether there was anything at all that he wanted to say to which Mothersil replied, "No. (Tr. 12.) The sentence imposed was agreed upon and arrived at after the parties had discussed the case extensively at the dispositional conference. (Tr. 7.)

At the PCR hearing, Mothersil testified that he was born on August 17, 1981 in Port of Prince, Haiti. He moved to the United States with his father when he was nine years old. He came to the United States because he had polio as a child and Haiti lacked medical services for him. His family lived in Brooklyn, New York, interrupted by a brief residence in Boston. He moved to Maine in 2005 and has a girlfriend, Heather, with whom he has a baby. Heather also has two other children. Mothersil never became a legal U.S. citizen.

Mothersil does not recall his plea counsel asking him where he was born or whether he was a U.S. citizen. Mothersil did not tell his attorney that he was born in Haiti and that he was not a U.S. citizen. Mothersil did not think it mattered because he had had a prior criminal history that included a felony drug conviction in New York, during which he was never told there could be immigration consequences. Mothersil considers himself "American" because he has a family, a girlfriend, kids, got his GED - all here – "most of my life has been in America." Mothersil did not think about immigration or deportation when charged here in Maine.

Mothersil explained to his plea counsel that he wanted to be with his family. His family is his girlfriend, her two children and their one child. Mothersil testified that if he had been told of the immigration consequences he would have been scared and he would

4

have told his attorney that he was a citizen of Haiti. The initial plea offer was five years with all but two years suspended plus probation. Eventually, he received a better plea offer of five years with all but 1 year suspended in prison and two years of probation. Plea counsel also told him that if he took the deal he would only serve 9 months. For Mothersil, this meant, "I would get home with my girlfriend and kids." He was told that the plea offer was time sensitive or he would go to trial. He did not want to go to trial. His plea counsel told him that he would lose at trial because of the evidence they had against him, "so I just took the plea."

Mothersil explained that when the judge asked him about his birthplace and citizenship,

> I was nervous, I know that I lied, I was very nervous. The judge told me if I wasn't a U.S. citizen there could be complications. She did not use the words immigration or deportation. I did not know what she was talking about and did not think this could affect my plea. I took the plea just to get back with my family. I would not have followed through with my plea if the judge had told me about the consequences of immigration because I would have been held by immigration.

At the time of his plea, immigration consequences did not even cross his mind because of his New York experience.

Heather Howell also testified at the hearing. She accompanied Mothersil to his appointments with his plea counsel. She did not know at that time that Mothersil was born in Haiti and was not a U.S. citizen. Even when she discussed this matter with counsel on the day of the plea neither immigration or citizenship or deportation came up. Howell did not learn that Mothersil was not a U.S. citizen until she went to the correctional facility in Windham and learned there was an immigration hold on him.

Mothersil's plea counsel testified consistent with Mothersil and Howell's testimony. He recalled that they talked about where Mothersil was from and Mothersil's

5

New York conviction, but he did not ask Mothersil if he was a U.S. citizen. For the attorney, the prior New York conviction was part of the context. Plea counsel saw no red flags that he should ask additional questions. Plea counsel testified "I absolutely believed he was a U.S. citizen all the way until Attorney [] told me otherwise a few months ago." If plea counsel had known that Mothersil was from Haiti and a noncitizen, he would have consulted with an immigration attorney. Consulting with ILAP is part of plea counsel's regular practice. However, he never discussed with Mothersil where he was born or the consequences for a noncitizen. When the judge inquired of Mothersil and he responded Brooklyn, N. Y. and said he was an American citizen, his answers were consistent with plea counsel's knowledge at that time.

## DISCUSSION

To determine whether Mothersil received constitutionally ineffective assistance of counsel, this court must examine:

> [F]irst, whether there has been serious incompetency, inefficiency, or inattention of counsel amounting to performance . . . below what might be expected from an ordinary fallible attorney; and second, whether any such ineffective representation likely deprived the defendant of an otherwise available substantial ground of defense.

*Alexandre v. State*, 2007 ME 106, ¶ 43, 927 A.2d 1153, quoting *Aldus v. State*, 2000 ME 47, ¶ 12, 748 A.2d 463. "[T]he federal and state guarantees are virtually identical." *McGowan v. State*, 2006 ME 16, ¶ 12, 894 A.2d 493.[2] "The burden is on the defendant

---

[2] The test, as articulated by the United States Supreme Court is:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

to prove both prongs." *Id.* Generally, the court "begin[s] with the second prong regarding prejudice because if it is determined that there was no prejudice, there is no need to address the first prong regarding whether counsel's performance was deficient." *Francis v. State*, 2007 ME 148, ¶ 4, 938 A.2d 149. In this case, the court considers these two issues so interrelated that the court does not begin with prejudice or analyze these two prongs separately.

Plea counsel's performance fell measurably below the performance that might be expected of an ordinary, fallible attorney. Both the United States Constitution and the Maine Constitution guarantee that a criminal defendant is entitled to the effective assistance of counsel. U.S. Const. amend. VI; Me. Const. art. I, § 6; *Stack v. State*, 492 A.2d 599, 601 (Me. 1985) (citations omitted) ("[W]henever there is a right to counsel, there is a right to the effective assistance of counsel.").

The "purpose of the constitutional requirement of effective counsel is 'to ensure a fair trial.'" *Id.* ¶15 (quoting *Strickland*, 466 at 686). "That purpose, in the context of a conviction based on a guilty plea, is to ensure that the advice of counsel is within the realm of an ordinary competent attorney because the voluntariness of the plea hinges upon whether the advice is that of an ordinary competent attorney." *Aldus*, 2000 ME 47, ¶15, 748 A.2d 463 (citing *Hill v. Lockhart*, 474 U.S. 52, 56-67 (1985)). The inquiry is "whether the plea proceeding produced a just result which is the 'knowing and voluntary entry of a guilty plea by a guilty party.'" *Id.* (quoting *Laferriere*, 1997 ME 169, ¶11, 697 A.2d 1301).

---

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
*Strickland v. Washington*, 466 U.S. 668, 687 (1984).

7

Before deciding whether to plead guilty, "a defendant is entitled to 'the effective assistance of competent counsel.'" *Padilla v. Kentucky*, 130 S. Ct. 1473, 1482 (2010). Furthermore, "counsel must inform [the] client whether his plea carries a risk of deportation." *Id.* at 1486. "It is quintessentially the duty of counsel to provide [the] client with available advice about an issue like deportation and the failure to do so 'clearly satisfies the first prong of the *Strickland* analysis.'" *Id.* at 1487.[3]

In support of the holding in *Padilla*, the Supreme Court cited professional standards that it described as "valuable measures of the prevailing professional norms of effective representation, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law." *Id.* at 1482. The Court cited, among other standards, the National Legal Aid and Defender Association (NLADA) Performance Guideline for Criminal Representation (hereinafter "NLADA Guidelines") and the American Bar Association (ABA) Standards for Criminal Justice, Pleas of Guilty (hereinafter "ABA Pleas of Guilty Standards").

This Court also considered the analogous local standards of the Maine Commission on Indigent Legal Services (MCILS) (hereinafter "MCILS Standards")[4] and

---

[3] Under *Strickland*, courts first determine whether counsel's representation "fell below an objective standard of reasonableness," and then ask whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. In *Hill v. Lockhart*, 474 U.S. 52 (1985), the Supreme Court reformulated *Strickland's* second prong for post-conviction review cases arising from a plea. Under *Hill*, the prejudice prong requires a showing by the petitioner "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 59.

[4] MCILS adopted standards for their approved indigent attorneys, including Chapter 2, Standards for Qualifications of Assigned Counsel, effective June 25, 2010, and Chapter 102, Criminal Defense Standards, effective September 27, 2012. Chapter 102 "establishes standards of practice for Commission assigned counsel providing representation in adult criminal cases." MCILS adopted theses standards to guide assigned counsel in the conduct of their representation and for use by the Commission in evaluating, supervising and training assigned counsel. This court is cognizant that MCILS did not adopt its Criminal Defense Standards until after Mothersil's plea.

8

M.R.Crim.P 11(h).   Although the Criminal Defense Standards of MCILS did not become effective until June 27, 2012, the requirement placed upon attorneys of warning of immigration consequences has been a requirement of M.R.Crim.P. 11(h) since at least 2002. Rule 11 was amended in 2002 to include the warning of immigration consequences because,

> [i]t has become increasingly clear that what may appear to a defendant and defense counsel as an attractive plea agreement may contain a hidden danger of serious immigration consequences for a defendant who is not a United States citizen.

Advisory Note – 2002 to M.R.Crim.P. 11(h).  Citing *Aldus*, *supra*, the 2002 Committee Note observed,

> The purpose of the amendment is preventive; it seeks both to prevent an improvident plea and to prevent the burdens of post-conviction review. The amendment builds into the guilty plea proceeding a pause—a "stop-look-and-listen"—to ponder whether there may be serious immigration consequences of the plea. The amendment directs the court to alert defense counsel and unrepresented defendants that they may need to pause to explore hidden, serious immigration consequences of the plea.
> The purpose of the amendment is not to furnish an additional ground for collateral attack on the plea, and failure to comply with the subdivision is not intended as a ground for collateral attack. The purpose of the amendment is to prevent collateral attack and to promote both fairness and finality.

The 2009 Amendment to Rule 11(h) added to the title of the Rule, "NOTICE AS TO POSSIBLE IMMIGRATION CONSEQUENCES". This amendment Highlighted immigration consequences in the title to Rule 11(h) and clarified that M.R.Crim.P. 11(h) applies to any crime since a plea to a felony or misdemeanor may trigger immigration consequences.  In November 2011, another amendment to Rule 11(h) provided further amendment as follows:

9

Rule 11(h), is modified in light of *Padilla v. Kentucky*, 559 U.S. __, 130 S. Ct. 1473 (2010), holding that in the context of a plea by a noncitizen, to meet the Sixth Amendment's effective-assistance-of-counsel guarantee, defense counsel must advise the noncitizen client regarding the risk of deportation. More specifically, when it is "clear" under federal immigration law that the consequence of a particular plea is deportation, defense counsel must advise the noncitizen client of that fact. *Id.* at 1483. When, instead, the deportation consequences of a particular plea are "unclear or uncertain" under federal immigration law, defense counsel's obligation is satisfied by informing the noncitizen client that the plea "may carry a risk of adverse immigration consequences." *Id.* Despite these modifications to the subdivision, the court itself has no obligation to inform the noncitizen about or predict the nature of any possible immigration consequences of the plea.

Advisory Note - 2011 to M.R.Crim.P. 11(h).

In order to comply with a defense lawyer's professional responsibilities, counsel should determine the "immigration status" of *every* client at the *initial* interview. *See* NLADA Guidelines, 2.2(b)(2)(A) *and* MCILS Standard 5.4(D)(6). Without knowledge that the client is a noncitizen, the lawyer cannot fulfill his responsibilities to advise the client about immigration consequences. The MCILS Standards also require counsel, during the initial interview, to convey to the client "the likely and maximum potential consequences." *Id.* at 5.4(C)(6).

At the plea bargaining stage, NLADA Guideline 6.2(a) specifies that as part of an "overall negotiation plan," prior to plea discussions, counsel should make sure that the client is fully aware of possible consequences of conviction, including "deportation." *Id.* NLADA Guideline 6.3(a) requires that counsel explain to the client "the full content" of any "agreement," including "the advantages and disadvantages and potential consequences." *Id.*

Furthermore, both the MCILS Standards and NLADA Guidelines require that prior to entry of the plea, counsel must make certain that the client "fully and completely

understands . . . the maximum punishment, sanctions and other consequences the client will be exposed to by entering the plea." MCILS Standard 5.16(A)(2); NLADA Guideline 6.4(a). The MCILS Standards specify that counsel "must also advise the client of . . . conviction consequences for non-citizens." *Id.* at 5.17(F). The ABA Standards set forth similar responsibilities. Standard 14-3.2(b) provides: "To aid the defendant in reaching a decision [regarding a plea], defense counsel, after appropriate investigation, should advise the defendant of alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision." *Id..* And ABA Standard 14-3.2(f) provides: "To the extent possible, defense counsel should determine and advise the defendant, sufficiently in advance of the entry of any plea, as to the possible collateral consequences that might ensue from entry of the contemplated plea." *Id.* With respect specifically to immigration consequences, the ABA emphasizes that "counsel should be familiar with the basic immigration consequences that flow from different types of guilty pleas, and should keep this in mind in investigating law and fact and advising the client." *Id.*, cmt. at 127.

The fact that many states, including Maine, *see* M.R. Crim. P. 11(h), require courts to advise defendants of potential immigration consequences of a guilty plea does not obviate the need for defense counsel to investigate and advise the defendant. The ABA's commentary to Standard 14-3.2 states that the court's "inquiry is not, of course, any substitute for advice by counsel," because:

> The court's warning comes just before the plea is taken, and may not afford time for mature reflection. The defendant cannot, without risk of making damaging admissions, discuss candidly with the court the questions he [] may have. Moreover, there are relevant considerations which will not be covered by the judge in his [] admonition.

11

*Id. See also* ABA Pleas of Guilty Standard 14-3.2(f), cmt. at 126 ("[O]nly defense counsel is in a position to ensure that the defendant is aware of the full range of consequences that may apply in his [] case.").

In this case, trial counsel's performance fell measurably below the performance that might be expected of an ordinary, fallible attorney. This court concludes that there is a reasonable probability that, but for counsel's errors, Mothersil would not have pleaded guilty and would have insisted on proceeding otherwise. If he had known that his guilty plea would lead to his deportation, then he would not have pled guilty. He did not want to return to Haiti. He considered the United States as his home and he wanted to remain with his family in Maine. As a result of plea counsel's errors, Mothersil's plea did not represent a voluntary and intelligent choice.

The Supreme Court has held that "the voluntariness of the plea hinges upon whether the advice [of the defendant's attorney] is that of an ordinary competent attorney." *Hill*, 474 U.S. at 56-67. In this case, a competent attorney would have asked Mothersil where he was born, whether he was a U.S. citizen and the consequences of being a noncitizen before the Rule 11 proceedings and thereby would have learned that the Petitioner was not a U.S. citizen. Such an attorney would not have advised the Mothersil to plead guilty to the charge before consulting an immigration attorney and informing Mothersil of the immigration and deportation consequences of the plea. The fact that the plea court inquired about Mothersil's birthplace and citizenship during the Rule 11 proceedings did not obviate the need for plea counsel to investigate and advise Mothersil beforehand. Thus, Mothersil's plea was not voluntary

12

In considering the prejudice, the court cannot discount that the plea judge asked Mothersil, "Are you pleading guilty, sir, because you are in fact guilty" to which Mothersil responded, "Yes ma'am." (Tr. 8.) The court also cannot discount the fact that Mothersil was dishonest when he answered the plea judge's questions about his birthplace and his citizenship. Nevertheless, for the reasons discussed above, the court finds that Mothersil's plea was not voluntary and he should be permitted to withdraw his plea.

The entry is: Post-Conviction Petition Granted.

Date: February 8, 2013

Joyce A. Wheeler, Justice
Maine Superior Court